CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 24 2005

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| **JAMES RAY,** | ) | Civil Action No. 7:04CV00134 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | By: James C. Turk |
| Defendant. | ) | Senior United States District Judge |

The Plaintiff, James Ray ("Ray" or "plaintiff"), brought this Title VII action against the defendant, CSX Transportation, Inc. ("CSX" or "defendant"), alleging that plaintiff was discriminated against because of his race. The parties tried the case before a seven-member jury, which returned a verdict in plaintiff's favor and awarded both compensatory damages and back pay. The Court gave both sides fifteen days to file any post trial motions. Pending before the Court is the defendant's Motion for Judgment as a Matter of Law (Dkt. No. 33) and Plaintiff's Motion to Enter Judgment on the Jury Verdict (Dkt. No. 34). After hearing oral arguments and reviewing the record in the case, the Court concludes that the defendant's motion must be granted and plaintiff's motion denied.

## I.

The evidence at trial, taken in a light most favorable to the plaintiff, established the following. After 21 years of service with CSX in other locations, plaintiff was transferred to CSX's Glasgow, Virginia work site[1] on March 31, 2003. After being at the Balcony Falls site for

---

[1] At trial, the work site at Glasgow, Virginia was referred to as "Balcony Falls;" the Court will do the same.

seventeen days, CSX became suspicious that several Balcony Falls employees had been wrongfully claiming overtime that they did not work. On April 17, 2003, defendant pulled plaintiff from the job and suspended him pending an investigation. As a result of the investigation, plaintiff and three white employees were charged with CSX policy violations alleging that they had wrongfully claimed unearned overtime from CSX. Plaintiff was eventually terminated for the violations while the other white employees who were charged with overtime violations, were not.

The possibility that certain Balcony Falls employees might be engaging in payroll fraud first came to the defendant's attention when William Hardbarger ("Hardbarger"), a CSX engineer assigned to Balcony Falls, was observed at a CSX office several miles from Balcony Falls while still logged on at the site. Steve Persinger ("Persinger"), a CSX Trainmaster, assumed responsibility for investigating whether other overtime policy violations existed at the Balcony Falls site. As part of this investigation, Wes Knick ("Knick") visited the Balcony Falls site. Knick observed the train crew finish its work for the day, but contrary to CSX's policy, the crew did not log off from the train's destination terminal. Thus, Knick made visual confirmation of CSX overtime policy violations.[2]

Meanwhile, Persinger continued his investigation at his office. There, he accessed the log-in/log-out times for all Balcony Falls employees from mid-March through April 17, 2003.[3]

---

[2] The offending crew that day was composed of T.S. Mahaffey ("Mahaffey"), a CSX engineer, and the plaintiff.

[3] Persinger had access to another CSX computer program that would have given him the log-in/log-out times for any employee further in the past. To get this information, however, Persinger would have had to enter each employee's identification number into the program. Given the number of employees at CSX and Persinger's suspicion being limited to the Balcony Falls work site, the amount of effort required to discover the violations would have been much greater than the scope of the violations demanded.

2

Because some employees had logged-off from terminals that Persinger did not recognize, he sent an e-mail to CSX's Information Security Office in Jacksonville, Florida ("Infosec"). Infosec explained that certain Union officials, employed by CSX,[4] had access to a computer program called the "Blue Zone." The Blue Zone program was intended to allow the Union officials to access the CSX computer system in order to obtain information regarding Union employees. The software had the unintended effect, however, of allowing employees with the software and an internet connection to log-off from a remote location, usually the employee's home. The terminals that Persinger could not identify were actually the remote locations where the employee had used the Blue Zone to log-off.

Given this explanation, Persinger suspected that several employees had claimed overtime that they had not earned. In order to confirm his suspicion, Persinger obtained the "engine download" information from the "black box" of the relevant train. This information allowed Persinger to see when the engine of the train shut down for the day. Once Persinger had this information he was able to determine the approximate time that the crew should have logged-off.[5] Persinger discovered, however, that the engine download information for the relevant train was available only from April 11, 2003 through April 17, 2003.[6]

Since the engine download information was necessary to bring a successful charge for

---

[4]Ray was not a Union official, and did not have authorization to possess the Blue Zone software under any circumstance.

[5]The evidence was that a crew usually took about twenty minutes after a train's engine shut down to complete the necessary paper work and log-off, but that it never took more than an hour.

[6]The black box had a limited amount of recording tape, and continuously re-wrote itself. If a train was used daily, the tape stored approximately six days of information before it wrote over previous recordings.

3

overtime policy violations, John Thompson ("Thompson"), Director of Labor Relations for the Huntington Division of CSX, instructed Persinger to charge each employee who used the Blue Zone to claim unearned overtime on dates the engine download information was available. Additionally, Persinger was instructed to charge Hardbarger and plaintiff for a violation on April 5, despite the missing engine download information, only because Hardbarger had confessed to claiming unearned overtime on that date. As a result of this instruction, plaintiff was charged with four overtime policy violations.[7]

Pursuant to a Collective Bargaining Agreement ("CBA") between CSX and the Union, the company conducted a Board of Inquiry for each charged violation. At each Board of Inquiry, the plaintiff took full responsibility for the violation and exonerated the other employees with whom he was charged. Additionally, plaintiff refused to divulge where he received the Blue Zone software. Following the Boards of Inquiry, Gery Williams, the head of the Huntington Division, decided to terminate plaintiff while imposing less sever discipline on the three white employees. Pursuant to the CBA, Ray appealed the decision. As a result of an arbitration award, nearly 20 months after he had been terminated, plaintiff was reinstated, without back pay.[8] Although he reinstated plaintiff, the arbitrator found that there was "not a scintilla of credible proof [of] any form of racial discrimination[.]"[9]

---

[7]Plaintiff was charged with a violation on: 1) April 5 and 14, 2003, along with Hardbarger (two separate violations); 2) April 16, 2003, along with Mahaffey; and 3) April 11, 2003, along with Larry Woodward ("Woodward"), another CSX employee assigned to Balcony Falls.

[8]After CSX had reinstated plaintiff and promised him that no further charges would be brought, plaintiff revealed that it was Woodward who had supplied him with the Blue Zone software.

[9]Defendant's Trial Exhibit # 1.

4

## II.

In reviewing a motion for judgment as a matter of law, a court "must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence." *Reeves*, 530 U.S. at 135. A court should leave intact a jury's verdict if reasonable minds could differ about the result in the case. *See Bryant v. Aiken Regional Medical Centers, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). A court, however, should not act as a "rubber stamp convened merely to endorse the conclusions of the jury[.]" *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996). Rather, judgment as a matter of law "is mandated where the facts and the law will reasonably support only one conclusion." *See Id; Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (internal quotations and citations omitted). After hearing oral argument and reviewing the evidence in a light most favorable to the plaintiff, the Court finds that the evidence leads to one conclusion: that plaintiff was not actually discriminated against because of his race.

To establish a *prima facie* case of racial discrimination in a disparate discipline case, plaintiff must show: 1) that he is a member of the class protected by Title VII; 2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and 3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v. CSX Transportation Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Under the scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff's *prima facie* case establishes a presumption that the employer unlawfully discriminated against the employee. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). This presumption, in turn, places on the defendant the burden of producing evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory

5

reason.'" *Id.* at 507 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  If the defendant presents such evidence, "the *McDonnell Douglas* framework - with its presumptions and burdens - is no longer relevant."  *Id.* at 510.

The burden is on the plaintiff, then, to show that the adverse employment decisions were actually motivated by racial discrimination.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citing *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).  The plaintiff may meet this burden by showing the falsity of the employer's proffered explanation.  *Id.*  If the plaintiff does so, the trier of fact is permitted to infer the ultimate fact of discrimination from the falsity of the explanation.  *Id.* at 147.  The plaintiff bears the ultimate burden, in all circumstances, to prove that an individuals's protected status was the actual motivating factor for the adverse employment action at issue.  *Id.; St. Mary's Honor Ctr.*, 509 U.S. at 507-08.

### III.

As stated above, the evidence at trial was that plaintiff used the Blue Zone to claim unearned overtime on several occasions in April, 2003.  In each Board of Inquiry, plaintiff admitted that claiming the unearned overtime was wrong and took full responsibility for each employee with whom he was charged.  *See* Plaintiff's Trial Exhibits 14, 18 and 19.  He expressly stated at the respective Boards of Inquiry that Hardbarger, Woodward and Mahaffey had nothing to do with the Blue Zone or with the claiming of unearned overtime.  *Id.*  Moreover, plaintiff outright lied at the Boards by telling CSX that he did not remember who had given him the Blue Zone.[10] At

---

[10]Despite plaintiff's reference regarding his "honesty about his own transgressions," Plaintiff's Memo at 18, at trial, plaintiff admitted he lied at the Boards both about the involvement of the other employees with the Blue Zone and about not remembering where he obtained the Blue Zone software.

that point, plaintiff set himself apart, admitting that his behavior was more serious than the others.

The only reasonable inference to be drawn from the evidence, even after taking the facts in a light most favorable to the plaintiff, is that plaintiff intended to exonerate those employees charged with him. There can be no doubt that, as between the four charged employees, plaintiff's statements made his conduct more serious than the others. Accordingly, the Court concludes that plaintiff did not present sufficient evidence to make out a *prima facie* case of discrimination because he did not show that his conduct was comparable in seriousness to the misconduct of the other charged employees. *See Cook*, 988 F.2d at 511.

Assuming, however, that plaintiff had made out a *prima facie* case, the verdict cannot stand because the plaintiff has not shown that a reasonable probability exists that plaintiff's termination was actually motivated by discrimination. Since defendant has proffered a legitimate, nondiscriminatory rational for the adverse employment actions, plaintiff's case hinges on whether he presented sufficient evidence of the falsity of defendant's explanations such that the jury was permitted to infer discrimination. *See Reeves*, 530 U.S. at 143. The Court finds that he did not.

In his brief, plaintiff argues that the jury had sufficient evidence upon which to conclude discriminatory intent. In support of his argument plaintiff offers evidence that shows the falsity of defendants contention that "[n]one of the white employees engaged in conduct as serious as that of plaintiff . . . ." Plaintiff's Memo at 15, quoting CSX's Memo at 10. Plaintiff essentially argues that CSX orchestrated the investigation, charges and Boards of Inquiry in a manner that made it appear that plaintiff was more culpable than the other employees. CSX did this by: 1) only investigating the use of the Blue Zone after March 31, 2003, the date that plaintiff started at the Balcony Falls site; 2) ignoring the white employees use of the Blue Zone and charging only on dates that the plaintiff had claimed overtime using the Blue Zone; 3) relying on plaintiff's

7

"honesty" to obscure the multiple overtime violations by other white employees and diminish their culpability for their own use of the Blue Zone to claim overtime. The Court will address each contention separately.

### A.

At trial, Persinger testified that the function he used on his computer to obtain log-in/log-off times for Balcony Falls employees allowed him to go back to mid-March for this information. He further testified that he went back as far as his computer permitted him and found the first discrepancy on April 3, 2003. This evidence is undisputed. When challenged by plaintiff's counsel, however, Persinger testified that there was a way for him to determine whether an individual employee used a remote terminal to log-off as far back as he wished to go. While Persinger could not have done this search on his own, he could have requested the information from CSX. Plaintiff maintains that this is where CSX's explanation disintegrates into pretext. Ostensibly, this is so because Persinger should have known to investigate further back to see if other employees besides those Persinger already suspected had used the Blue Zone to claim unearned overtime.

Evidence that Persinger could have investigated further back than he did does not mean that his reason for not doing so was pretext. The only inference that can reasonably be drawn from Persinger's testimony about the manner in which he proceeded with his investigation is that he was chiefly concerned with the present Balcony Falls crew.[11] He did not isolate his investigation to violations committed by the plaintiff only, but investigated all of the discrepancies that he found. In his e-mail, he asked Infosec for the identification of each terminal that he did not recognize, not

---

[11]Persigner had information already that Hardbarger, Mahaffey and plaintiff, all Balcony Falls employees, had claimed overtime which they did not work.

8

just the ones where had plaintiff logged-off on a remote terminal. Plaintiff's subjective belief that Persigner should have known that the overtime policy violations were broader than he first anticipated does not make his motivations suspect.

**B.**

As stated above, the evidence at trial revealed that two things were needed in order to charge an employee for an unearned overtime violation: 1) the engine download information from the black box to determine when the engine had shut down; and 2) the log-out time of the employee. Persinger obtained the engine download information that was available for the relevant train. The information was available only for April 11 through April 16. Persinger charged only those employees who used the Blue Zone to log-off and worked overtime during those dates, with only one exception.[12]

Plaintiff charges that defendant ignored white employees' use of the Blue Zone, namely Woodward's violations occurring on April 3 and April 6, without explanation. The evidence was, however, that defendant did not charge Woodward for these days because CSX did not have the black box information for those days. Far from ignoring these violations, they are present in the e-mail that Persinger sent to Infosec in the first instance. Importantly, CSX did not "ignore" any violations committed by white employees between April 11 and April 16. In fact, Woodward was charged for an overtime policy violation for a day which CSX had the engine download information. Moreover, to further support CSX's proffered explanation, the evidence shows that plaintiff himself was not charged for two days in which he logged-off using the Blue Zone and

---

[12] As stated earlier, Hardbarger and plaintiff were charged for April 5 because he had previously confessed to Persinger that he had wrongfully claimed overtime for that day.

apparently claimed overtime because there was no engine download information for those days.[13] Plaintiff's subjective beliefs that the charges were limited based on the engine download information in order to target him does not render defendant's explanations unworthy of belief.

### C.

As the Court stated when discussing plaintiff's *prima facie* case, the evidence at trial was that plaintiff took full responsibility for each violation for which he was charged and exonerated each employee with whom he was charged. *See* Plaintiff's Trial Exhibits 14, 18 and 19. Accordingly, defendant explained that it terminated plaintiff from his employment with CSX, and not the other charged employees, because plaintiff was admittedly more culpable then the others. In response to this explanation, plaintiff argues that his "honesty" could not possibly have exonerated every white employee who had ever used the Blue Zone. To maintain such a ludicrous position, plaintiff argues, shows the pretextual nature of CSX's explanation and allowed the jury to infer actual discrimination on the part of CSX.

Plaintiff overstates the evidence. At no time did CSX claim that plaintiff took responsibility for every claim of unearned overtime. Rather, as between plaintiff and the other three charged employees, plaintiff voluntarily took the blame for the overtime violations. The decision maker, Gery Williams, was presented with a record of four employees charged with violations and one of them having accepted full responsibility for all of the violations. Williams relied on plaintiff's own statements and took action accordingly.

A reasonable fact-finder could not conclude, on the evidence presented, that in order to rid itself of one particular black employee, CSX charged three white employees, along with plaintiff, knowing somehow that plaintiff would accept full responsibility for the other charged employees.

---

[13]*See* Plaintiff's Trial Exhibit # 4.

Plaintiff's subjective belief that he should not have been terminated after being "honest" and taking full responsibility for his violations does not create a reasonable inference that defendant fabricated its explanation for the adverse employment decision.

### IV.

As stated above, plaintiff did not make out a *prima facie* case. Assuming, however, that he had, the defendant proffered at trial a legitimate, nondiscriminatory reason for the adverse employment actions taken against plaintiff. Thus, the burden was on plaintiff to show that those adverse employment actions were actually motivated by race discrimination. While plaintiff was permitted to meet this burden through circumstantial evidence by showing that the defendant's legitimate, nondiscriminatory reasons were pretext, plaintiff failed to present such evidence. The facts of this case support only one conclusion: that the defendant's decision to charge and terminate plaintiff for his overtime violations was not actually motivated by race discrimination. Accordingly, this Court has no choice but to grant defendant's motion for judgment as a matter of law. *See DeJarnette,* 133 F.3d at 298. An appropriate order shall this day issue.

### V.

In the alternative, should higher authority not sustain this Court's grant of a judgment as a matter of law, this Court finds that a new trial pursuant to FED. R. CIV. P. 59 would be appropriate. It is within this Court's discretion to grant a new trial if it finds that the verdict was against the clear weight of the evidence. *See, e.g. Byrd v. Blue Ridge Rural Electric. Co-op, Inc.,* 356 U.S. 525 (1958). When considering whether a new trial should be granted, the facts are considered in a light less favorable to a non-movant than on a motion for judgment as a matter of law. *See, e.g. Williams v. Nichols,* 266 F.2d 389, 391-93 (4th Cir. 1959). Even if plaintiff's evidence could reasonably support an inference that defendant's proffered legitimate reason for terminating

11

plaintiff was pretextual, the weight of the evidence does not support the conclusion that the reasons for terminating plaintiff were pretext for discrimination. *See Reeves*, 530 U.S. at 147 (recognizing that it is not enough to disbelieve the employer, but the fact finder must believe the plaintiff's explanation of intentional discrimination). Accordingly, not requiring a new trial would constitute an injustice.

The Clerk is directed to send certified copies of this Memorandum Opinion and accompanying Order to all counsel of record.

ENTER:    This 23rd day of May, 2005.

*[signature]*
Senior United States District Judge